UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY A. KINNETZ, as Trustee of THE TIMOTHY A. KINNETZ REVOCABLE TRUST, <br><br> Plaintiff, <br><br> vs. <br><br> BENAIAH HOLDINGS, INC.; BENAIAH DIGITAL, LP; BENAIAH DIGITAL FIXED INCOME, LP; BENJAMIN PAUL WIENER, individually; JOSHUA DEWITT, individually; CHRISTOPHER CHARLES HMIELEWSKI, individually; BENAIAH CAPITAL, LLC; BENAIAH ENTERPRISES LLC; BENAIAH MANAGEMENT COMPANY, INC.; RUNWAY FOUR10 LLC; TRIPLE POINT TRADING LLC; RONALD GASCA JR., <br><br> Defendants. | 4:25-CV-04134-CCT <br><br><br> **ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

Pending before the Court is a motion to dismiss the first amended complaint filed by Plaintiff Timothy A. Kinnetz as trustee of the Timothy A. Kinnetz Revocable Trust (the Trust). Docket 103. Kinnetz opposes the motion on its merits and also because, in his view, defense counsel lacked authority to file the motion. Docket 127.

## BACKGROUND

Kinnetz is a businessman tied to the Okoboji, Iowa area and is the trustee of the Trust. Docket 97 ¶¶ 6, 23. In 2021, he became interested in

1

diversifying the Trust's large portfolio and saw digital assets as a potential source of capital gains. *Id.* ¶ 24. He consulted with legal and financial professionals prior to deciding that the Trust would invest cryptocurrency. *Id.* ¶¶ 24–25. Thereafter, the Trust's attorney introduced Kinnetz to Wiener, a business owner who held himself out as an experienced investment manager with deep experience in cryptocurrencies. *Id.* ¶¶ 26–27, 29.

Through multiple meetings, Kinnetz expressed to Wiener that he wanted to make a reasonable return on the Trust's investment through buying and holding cryptocurrencies. *Id.* ¶ 28. Wiener recommended that the Trust invest $5 million in certain entities and that Wiener would be paid advisory and performance fees. *Id.* ¶ 30. The Trust's attorney reviewed the investment documents and recommended that Kinnetz proceed with the investment on behalf of the Trust. *Id.* ¶ 32.

In December 2021, the Trust executed the necessary paperwork to invest $4 million into Benaiah Capital and Benaiah Digital. *Id.* ¶ 32. Pursuant to an agreement, the Trust transferred via wire $1 million to Benaiah Digital's account at Peoples Bank in Rock Valley, Iowa, to be invested through Benaiah Digital's investment fund. *Id.* ¶¶ 70, 73. Six days later, the Trust transferred via wire $3 million to an account at MVB Bank belonging to Payward Ventures, Inc. *Id.* ¶ 71. Payward is "a major cryptocurrency exchange called 'Kraken' through which Wiener established a cryptocurrency trading account on behalf of the Trust." *Id.*

Kinnetz contends that he and Wiener agreed that:

> Wiener would invest these funds as he saw fit, based on Wiener's best judgment in whatever he believed would provide a return on investment, including higher risk digital assets such as "altcoins," or new and less-capitalized emerging projects associated with unique tokens or other digital assets.

*Id.* ¶ 74. Further, Benaiah Capital was to manage the $3 million in the Kraken Account "for the purpose of buying and holding the cryptocurrency-equivalent of 'blue chip' stocks; in other words, less-speculative, established digital assets with established use cases and relatively high rates of institutional and consumer adoption." *Id.* ¶ 76.

The investments were governed in part by Benaiah Digital's Subscription Agreement and Benaiah Capital's Investment Management Agreement (IMA). *Id.* ¶ 78. The Subscription Agreement provides that the $1 million investment makes the Trust a limited partner of Benaiah Digital. *Id.* ¶ 79. "The IMA requires Benaiah Capital to manage the investment and reinvestment of the Trust's assets in accordance with the Trust's objectives as communicated by Mr. Kinnetz." *Id.* ¶ 80.

In early 2022, the Kraken Account had a balance of $3,138,792.50, Wiener had been keeping in close contact with Kinnetz and his team about the Trust's investment, and Wiener had been providing detailed summaries related to the Trust's investments. *Id.* ¶¶ 84–85. The Trust also received regular investment reports and statements. *Id.* ¶ 86. In early winter 2022, the global crypto market experienced a major crash, and the assets of the Trust dropped in value. *Id.* ¶ 87. After being advised by tax professionals and wealth managers, the Trust directed Benaiah Capital to realize $2,005,106 in capital

3

losses for the 2022 tax year. *Id.* ¶ 88. According to Kinnetz, he made this "'tax loss harvesting' strategy" on "the assurance from Benaiah and Wiener that it would 'reinvest' in crypto assets after the realized loss, with the goal of positioning the account for future capital gains." *Id.* Kinnetz further asserts that Wiener verbally represented that the reinvestment was made on February 17, 2023. *Id.* ¶ 89.

On November 18, 2023, the Trust received a letter from Wiener that the Benaiah Entities would be delayed in providing statements to investors. *Id.* ¶ 90. Around this same time, Kinnetz believed the Kraken Account held assets valued at $1,541,201 based on documentation Wiener had provided to the Trust. *Id.* ¶ 93. He requested that Benaiah provide a way for the Trust to independently examine the contents of its Kraken Account. *Id.* ¶ 91. Wiener gave Kinnetz access to an account, Koinly Account, that was purportedly tied to the Trust's Kraken Account and would allow Kinnetz to see in real time the balance of the digital assets in the Trust's account. *Id.* ¶ 92.

On November 30, 2024, Beniah Digital provided the Trust a statement indicating a balance of $956,124.53 in the Trust's account. *Id.* ¶ 96. The Trust did not receive any additional reports or statements regarding its investments after this November 2024 statement. *Id.* ¶¶ 97, 99. When Kinnetz inquired about the lack of statements, Benaiah blamed a change in its fund administrator. *Id.* ¶ 100. Benaiah had been using NAV Consulting, Inc. as its fund administrator. *Id.* ¶¶ 36, 98. Kinnetz notes that the cessation of NAV

meant the Trust could no longer access its accounts directly, which it had previously done through a NAV portal. *Id.* ¶ 101.

In March 2025, the Trust contacted Kraken to get direct access to its Kraken Account, and after obtaining that access, Kinnetz learned that the balance was $599.30. *Id.* ¶¶ 102–03. Kinnetz claims that Wiener and the Benaiah entities did not at any point disclose this account information to the Trust. *Id.* ¶ 106. In March and April 2025, the Trust made multiple demands to Wiener and his entities to provide a full accounting and return of the Trust's investments, including its digital assets. *Id.* ¶ 108. One request on April 29, 2025, "demand[ed] (i) an accounting of accounts and funds with Benaiah Capital and Benaiah Digital; (ii) access to, and confirmation of, Kraken account activity on behalf of the Trust; (iii) written confirmation of account closure and return of funds; and (iv) notice of terminating the IMA." *Id.* ¶ 111.

According to Kinnetz, "Wiener and his entities have consistently stated that they will honor the requests but cannot or will not do so in the time required." *Id.* ¶ 112. Wiener claimed certain processes and withdrawal periods caused the delay. *Id.* ¶ 114. Wiener also posted YouTube videos attempting to persuade investors to delay redemptions. *Id.* ¶ 119. The Trust eventually received, signed, and returned a Benaiah Digital redemption form. *Id.* ¶¶ 116–18. However, Wiener has not honored the redemption or cash-out requests. *Id.* ¶ 171(i). Kinnetz indicates he has since learned that in June 2025, the FBI and IRS conducted raids at business and personal addresses associated with Wiener related to Wiener's management of investor money and that the

conduct of the defendants have prompted multiple lawsuits seeking in excess of $10 million. *Id.* ¶¶ 120, 122. Kinnetz also learned through Wiener that the Benaiah entities loaned over $10 million to a third party, that the third party has since defaulted on repayment, and that Wiener intends to immediately liquidate all assets held by Benaiah Digital. *Id.* ¶¶ 121, 123.

Kinnetz brought suit against Wiener and others in this Court and requested the appointment of a receiver to protect stakeholders from further fraud, mismanagement, and dissipation of assets. *See generally* Dockets 1, 3. The Court granted Kinnetz's motion to appoint a receiver, Lighthouse Management Group (the Receiver), over two of the original entity defendants— Benaiah Capital, LLC and Benaiah Digital, LP. Docket 37. The Court then expanded the receivership, on a motion by the Receiver, to include additional entity defendants and Benjamin Wiener personally. Docket 95.

Near this same time, the Court also granted Kinnetz's motion for leave to file an amended complaint, Docket 96, and Kinnetz filed an amended complaint adding additional entity defendants and other defendants and a new racketeering (RICO) claim under 18 U.S.C. § 1962(c), Docket 97.[1] In response, Defendants Benaiah Capital, Benaiah Digital Fixed Income, Benaiah Digital, Benaiah Enterprises, Benaiah Holdings, Benaiah Management Company, Ronald Gasca, Jr., Christopher Hmielewski, Runway Four10, Triple Point

---

[1] There is a pending motion to dismiss Kinnetz's original complaint, Docket 39, and a motion to dismiss Joshua DeWitt's crossclaims, Docket 41, for lack of subject matter jurisdiction. However, those motions are now moot because Kinnetz filed an amended complaint. *See Dakota Provisions, LLC v. Hillshire Brands Co.*, 226 F. Supp. 3d 945, 951 (D.S.D. 2016).

Trading, and Benjamin Wiener filed a motion to dismiss the amended complaint. Docket 103.

Thereafter, a question arose concerning whether defense counsel, Kutak Rock LLP, could file such a motion on behalf of the entity defendants (except Triple Point Trading) because these defendants are subject to the receivership order. *See* Docket 133. The Receiver had informed Kutak Rock that it did not authorize Kutak Rock's services or the filing of the motion to dismiss on behalf of the receivership entities. Docket 127-1 ¶¶ 3–4. The Receiver directed Kutak Rock to withdraw the motion and withdraw from representation. *Id.* ¶ 4. The Receiver did not direct Kutak Rock to withdraw the motion on behalf of Wiener or withdraw from representing Wiener, although the Receiver noted that it did not expressly authorize Kutak Rock to represent Wiener. *Id.* ¶ 5.

Following the direction of the Receiver, Kutak Rock filed notice of withdrawal of joinder in the motion to dismiss on behalf of the receivership entity defendants and Triple Point Trading. Docket 131. Kutak Rock then filed a motion to withdraw as counsel in the litigation, including as counsel for Wiener, Hmielewski, and Gasca. Docket 132. During a hearing on January 6, 2026, which was originally scheduled to address a pending motion by the Receiver to compel Wiener to cooperate with the Receiver and turn over receivership assets, Docket 109, the Court addressed Kutak Rock's motion to withdraw as counsel in the litigation, Docket 150.[2] The Receiver indicated that

---

[2] A rough transcript of the January 6, 2026 hearing is at Docket 150.

while it did not oppose Kutak Rock representing Wiener, it also did not oppose Kutak Rock's motion to withdraw as counsel.[3] *Id.* at 9–10.

At the conclusion of the hearing, the Court granted the motion to withdraw, continued the motion to compel, and gave Wiener, Hmielewski, and Gasca until early February to retain new counsel and to file a reply brief on the pending motion to dismiss. *Id.* at 17–19; *see also* Docket 141; Docket 146 (order extending the deadline). Wiener, Hmielewski, and Gasca retained new counsel, Denevan Falon Law Firm Prof. LLC, and, on February 5, 2026, filed their reply brief in support of the motion to dismiss. Docket 147.

Although the motion to dismiss became ripe for the Court's consideration, additional issues arose concerning Wiener's ability to retain legal representation and the unresolved motion to compel. The Court scheduled a hearing on these matters for March 3, 2026, and in response, Denevan Falon Law Firm filed a motion to withdraw as counsel for Wiener, Hmielewski, and Gasca. Docket 155. Denevan Falon Law Firm noted that it had been retained to file the reply brief in support of the motion to dismiss, and further that while Wiener, Hmielewski, and Gasca are aligned on the motion to dismiss, a conflict of interest exists as it relates to the motion to compel and Wiener's legal representation. Docket 156 at 2.

At the hearing, the Receiver indicated that it did not oppose Denevan Falon Law Firm's withdrawal and does not oppose Wiener having separate legal

---

[3] Counsel for the Receiver misspoke at the hearing when he said that "the receiver also does not oppose Kutak Rock being the attorney for the *receiver.*" Docket 150 at 10 (emphasis added). It is clear that counsel meant *Wiener*.

representation; rather, the concern relates to the payment of legal fees.[4] Docket 189 at 8. Kinnetz also did not oppose Denevan Falon Law Firm's withdrawal. *Id.* However, he asserted that Wiener does not have the right to select his own counsel because he is personally subject to the receivership. *Id.* at 9–10.

The Court issued an oral ruling granting Denevan Falon Law Firm's motion to withdraw. *Id.* 11–12; *see also* Docket 171. The Court also indicated that Wiener has the right to be represented by counsel and that the Receiver agreed with that premise. Docket 189 at 12. The concern is how counsel would be paid, but no request had been made that receivership assets be used to pay Wiener's legal fees. *Id.* The Court noted that Wiener could represent himself going forward or hire new counsel to represent him, though an issue would likely arise concerning payment. *Id.* at 13. The Court thereafter addressed and granted the Receiver's motion to compel. *See generally id.*; *see also* Docket 166.

Following the March 3, 2026 hearing, Wiener, acting pro se, filed approximately 15 motions and objections related to the receivership, many of which are cast as emergency motions. Dockets 168, 173, 175–83, 185, 187, 190, 200, 209. The Receiver objected to Wiener's motions, Docket 212, filed an affidavit detailing Wiener's failure to comply with the Court's order to compel, Docket 203, and filed a motion to approve the sale of certain receivership assets, Docket 192. Hmielewski filed an objection to the Receiver's third report. Docket 198.

---

[4] A rough transcript of the March 3, 2026 hearing is at Docket 189.

9

These filings took priority in the docket, and the Court held hearings on April 2 and 10, 2026. While a written order is forthcoming, one motion concerned Wiener's right to use receivership assets to pay for legal representation. Docket 180. The Court orally denied his request, in part, because the pending motion to dismiss is fully briefed and the resolution of that dispositive motion would not require Wiener to incur attorney fees.[5] Docket 255.

Turning now to the motion to dismiss, Kinnetz first asserts that the Receiver did not authorize either Kutak Rock or Denevan Falon Law Firm to represent Wiener and thus neither had authority to file the motion dismiss or reply. Docket 159 at 4; Docket 127 at 6. Kinnetz notes that the receivership orders give the Receiver authority to retain legal counsel and Wiener is subject to the receivership. Docket 159 at 5. He thus argues that Wiener could not retain his own counsel, and as such, his past representation was unauthorized and the motion to dismiss and reply filed on his behalf should be denied or stricken. *Id.* at 4 n.1, 5–6.

The Court declines to deny or strike the motion to dismiss or reply. Although Wiener is personally subject to the receivership and the Receiver did not give express authorization for Kutak Rock or Denevan Falon Law Firm to represent Wiener, the Receiver recognized Wiener's right to obtain separate legal representation, and it did not object to either law firm representing Wiener in this case. *See generally* Dockets 150, 189. Importantly, neither

---

[5] A rough transcript of the April 10, 2026 hearing is at Docket 255.

Kutak Rock's nor Denevan Falon Law Firm's legal fees have been paid through receivership assets. Further, nothing in the record suggests the Receiver objects to the Court considering the motion to dismiss and reply filed by Kutak Rock and Denevan Falon Law Firm on behalf of Wiener, Hmielewski, and Gasca. Finally, even if these law firms did not have authority to submit filings on behalf of Wiener, Kinnetz has not shown they lacked authority to do so for Hmielewski and Gasca. Therefore, the Court addresses the motion to dismiss on its merits.

**LEGAL STANDARD**

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court "must accept a plaintiff's factual allegations as true" and construe all reasonable inferences in the plaintiff's favor "but need not accept a plaintiff's legal conclusions." *Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768–69 (8th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Detailed factual allegations are not necessary, but "labels and conclusions" and "'naked assertion[s]' devoid of 'further factual enhancement'" do not satisfy the plausibility standard. *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted). Rather, the standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Id.*, "even if it strikes a savvy judge that

11

actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely[,]'" *Twombly*, 550 U.S. at 556 (citation omitted).

## DISCUSSION

Wiener, Hmielewski, and Gasca (the Movants) assert that Kinnetz's RICO claim fails because it is barred by operation of law under the Private Securities Litigation Reform Act (PSLRA) of 1995. Docket 103 at 2. Alternatively, the Movants contend that even if the PSLRA does not bar Kinnetz's RICO claim, he has failed to sufficiently plead a RICO enterprise distinct from the alleged pattern of racketeering, a RICO enterprise that is distinct from the persons accused of violating 18 U.S.C. § 1962(c), and that he suffered actual harm proximately caused by the alleged predicate acts. *Id.*

### I.    Whether the PSLRA bars Kinnetz's RICO claim

Section 1964(c) of the RICO Act provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c). However, the statute was amended in 1995 when Congress enacted the PSLRA and narrowed the type of conduct that could qualify as predicate acts for a RICO claim. Pub. L. No. 104-67, 109 Stat. 737 (1995); *see also Bald Eagle Area Schl. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3d Cir. 1999). The amendment is known as the "RICO Amendment," and its intent is "to 'eliminate securities fraud as a predicate offense in a civil RICO action[.]'" *Bald Eagle*, 189 F.3d at 327 (citation omitted);

12

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 273 (2d Cir. 2011). The RICO Amendment provides: "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c).

Courts have interpreted the RICO Amendment to apply to "'any conduct actionable as fraud in the purchase or sale of securities' as a predicate act for a private cause of action under RICO." *Bald Eagle*, 189 F.3d at 327 (citation omitted). Therefore, "[t]he RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws." *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003); *Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000). Further, because securities fraud is no longer a predicate offense for a RICO claim, "a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses" when "the conduct giving rise to those predicate offenses amounts to securities fraud." *Bald Eagle,* 189 F.3d at 330; *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.,* 205 F. Supp. 2d 243, 248 (S.D.N.Y. 2002) ("In amending RICO, Congress was clear in stating that the PSLRA 'was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim.'" (citation omitted)).

However, not every fraud that happens to involve securities is a securities violation implicating the RICO Amendment. *Petters Co., Inc. v. Stayhealthy, Inc.,* No. Civ.03-3210 JRT/FLN, 2004 WL 1465830, at *3 (D.

13

Minn. June 1, 2024) (noting that it was not the intent of Congress in enacting the RICO Amendment to "convert every common-law fraud that happens to involve securities into a violation of § 10(b)" (citation omitted)); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 369 (S.D.N.Y. 2005) (noting that not all conduct that may have involved securities fraud is actionable under securities laws); *D'Addario v. D'Addario*, 75 F.4th 86, 93 (2d Cir. 2023). Rather, for the RICO Amendment to apply, there must be a connection between the securities transaction and the alleged fraud. *Petters*, 2004 WL 1465830, at *3 (there must "be some connection between the securities transaction and the misrepresentation"); *D'Addario*, 75 F.4th at 93 (concluding "that for a claim to be barred, the fraud must be '*in* the purchase or sale of securities'" (citation omitted)); *OSRecovery*, 354 F. Supp. 2d at 369–70; *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 334 (7th Cir. 2019).

"To best define what constitutes conduct actionable as fraud in the purchase or sale of securities, courts have consulted an obvious source in Section 10(b) of the Securities Exchange Act of 1934, which—while not identical to the language of the RICO Amendment—covers a broad range of securities fraud." *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 644 (S.D.N.Y. 2017). "Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes illegal the use of a manipulative or deceptive device *in connection with the sale or purchase of a security* by any instrumentality of interstate commerce . . . and establishes two kinds of liability: false statement liability (17 C.F.R. § 240.10b–5(b)) and scheme liability

14

(17 C.F.R. § 240.10b–5(a), (c)).” *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 389 (8th Cir. 2016) (internal citations omitted) (emphasis added). Importantly, “the requisite showing . . . is deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller.” *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (citation modified).

The Movants argue that Kinnetz’s RICO claim is actionable as securities fraud because the amended complaint alleges fraudulent conduct in connection with Kinnetz’s purchase of an investment contract. Docket 147 at 8. The Movants note Kinnetz’s allegation that Wiener made misrepresentations to induce him “to use the wires to transmit the $4 million of investments in December 2021” in two entities operated by Wiener, which included the limited partner interest sold to Kinnetz pursuant to the IMA. *Id.* at 5–6, 8. The Movants also claim that Kinnetz “alleges securities fraud in connection with investor funds raised in 2025 that were wired to Benaiah Capital.” *Id.* at 8. In the Movants’ view, Kinnetz’s allegations establish two types of liability under § 10(b) and Rule 10b-5, namely false statement and scheme liability. *Id.* at 7. The Movants thus contend that Kinnetz RICO claim is barred by the RICO Amendment. *Id.* at 7–9.

The Court first looks at the conduct pled in the amended complaint as predicate acts to determine whether these predicate acts are actionable as securities fraud. The pattern of racketeering activity, according to the amended complaint, includes “transmissions by means of wire, radio, or television

15

communication with intent to defraud [Kinnetz]." Docket 97 ¶ 130. The amended complaint then sets out the predicate acts more specifically as:

(a) Intentionally using the U.S. Postal Service to regularly mail to Plaintiff knowingly false or materially misleading financial statements in furtherance of the RICO Defendants' fraudulent scheme to convert Plaintiff's funds;

(b) Intentionally using interstate wires, including cellular telephone service, text messaging, email, and other internet communications to knowingly provide Plaintiff false or materially misleading information in furtherance of the RICO Defendants' fraudulent scheme to convert Plaintiff's funds;

(c) Intentionally using interstate wires, including bank wire transfers, to knowingly receive Plaintiff's fraudulently induced transfers of funds, disguise the destinations of those funds, convert those funds for themselves, and receive funds from other investors in order to defraud Plaintiff into believing that Defendant Wiener was still in possession of Plaintiff's funds and in furtherance of the RICO Defendants' fraudulent scheme to convert Plaintiff's funds.

(d) Intentionally using interstate wires, including internet communications and bank wire transfers, to knowingly receive funds from Plaintiff with the intent of defrauding it into believing that it had invested in cryptocurrency; knowingly creating a software account and manipulating that account in a manner designed to defraud Plaintiff into believing it showed the real-time location and value of his cryptocurrency; then knowingly and secretively converting Plaintiff's cryptocurrency or liquidating it before converting the liquidated sum, all in furtherance of the RICO Defendants' fraudulent scheme to convert Plaintiff's funds.

*Id.*

While Kinnetz's amended complaint also alleges that Wiener fraudulently induced him to enter into the IMA and Subscription Agreement, that alleged fraud is not connected to the sale or purchase of securities.[6] Rather, the fraud

---

[6] There is a question whether the $3 million wired to Benaiah Capital involves the sale of a security. *See* Docket 97 ¶¶ 71, 75–76. According to Kinnetz, this transaction does

16

is connected to Wiener's representations about his competence as an investment manager, expertise in investments and crypto currency, and ability to manage an investment fund. *See id.* ¶¶ 29, 139. Based on those inflated representations Wiener made about himself, Wiener was able to secure Kinnetz's participation in the IMA and Subscription Agreement and induce him to transfer $4 million on behalf of the Trust to the Benaiah Entities. *See id.* ¶ 139. This alleged conduct describes deception by Wiener, not fraud in connection with the purchase or sale of securities. *See, e.g., Cress v. Nexo Cap. Inc.*, No. 23-CV-00882-TSH, 2026 WL 296728, at *16 (N.D. Cal. Feb. 4, 2026) (finding that the alleged false statements about whether the defendant charged fees on certain transactions were not in connection with the sale of securities); *Menzies*, 943 F.3d at 335 (explaining that the misrepresentations must closely touch the sale itself).

It is also telling that the amended complaint does not challenge any term or condition of the investment itself or otherwise allege that the IMA or Subscription Agreement themselves are unlawful. And nothing in the amended complaint suggests that Wiener "secretly intend[ed] from the very beginning" to dishonor the agreements when inducing Kinnetz to make his investments. *See*

---

not involve the sale of a security because, unlike the $1 million investment making the Trust a limited partner of Benaiah Digital, the $3 million was to be placed in a cryptocurrency trading account specifically for the Trust and managed on behalf of the Trust. Docket 127 at 9 n.7. The Movants respond that "Mr. Kinnetz's $3 million investment in Benaiah Capital also satisfied the investment contract definition" because "Kinnetz invested money in Benaiah Capital to earn a profit solely through the efforts of others." Docket 147 at 11. The Court need not resolve the question whether the $3 million investment involves the sale or purchase of a security, because even if it does, the RICO Amendment would not apply to bar Kinnetz's RICO claim.

17

*SEC v. Zandford*, 535 U.S. 813, 824 (2002) (focusing on the secret intent of the seller when the sale occurred in finding a violation of § 10(b)). Instead, a review of the amended complaint reveals that the predicate acts supporting Kinnetz's RICO claim arose "when things went awry" for Wiener and related companies after the global crypto market crashed in early 2022. *See Zohar*, 286 F. Supp. 3d at 647; *Menzies*, 943 F.3d at 336 (noting that for the RICO Amendment to apply, the misrepresentations must closely touch the sale of securities, rather than the resulting consequences of the sale).

However, the Movants direct this Court to Kinnetz's allegations that the pattern of racketeering activity occurred from 2021 to present and that the predicate acts span 2021 to 2025. Docket 147 at 8 (citing Docket 97 ¶ 130). In the Movants' view, these allegations establish that Kinnetz's alleged pattern of racketeering activity "expressly includes use of wires in connection with [the Trust's] $4 million purchase of 'investment contracts[.]'" *Id.* On the contrary, the reference in the amended complaint to racketeering acts from 2021 is non-specific and does not support a determination that Kinnetz's RICO claim based on predicate acts occurring after the $4 million investment is actionable as securities fraud.

The Movants also claim that Kinnetz's RICO claim is barred because he "alleges securities fraud in connection with investor funds raised in 2025 that were wired to Benaiah Capital." *Id.* In the amended complaint, Kinnetz alleges that:

18

> Beginning in approximately March 2025 and continuing through the present date, Defendant Wiener has collected funds from Runway Four10 investors and transferred them to the control of Defendant Triple Point Trading. He has also wired large amounts of investor funds from Runway Four10 to Benaiah Capital.

Docket 97 ¶ 67. While this allegation suggests impropriety by Wiener, the Movants have not shown that the funds allegedly obtained from investors in 2025 were connected to the sale or purchase of securities. *Cf. Zohar*, 286 F. Supp. 3d at 650 (applying RICO Amendment because "the post-investment looting involved the purchase and sale of securities").

As one court recognized, "[t]he Supreme Court has cautioned that securities fraud under section 10(b) of the Securities Exchange Act of 1934 'must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation.'" *D'Addario*, 75 F.4th at 93 (quoting *Zandford*, 535 U.S. at 820). Here, Wiener's deception to induce Kinnetz to transfer $4 million, though involving securities, was not in connection with the sale or purchase of securities. As such, the Movants have not shown that the RICO Amendment bars Kinnetz's RICO claim.

## II.    Whether Kinnetz sufficiently pled the enterprise element of a RICO claim

The Movants assert that Kinnetz did not "allege a legally cognizable RICO enterprise" because he did not plead the existence of a RICO enterprise distinct from the racketeering activity. Docket 104 at 12. Relying on *United States v. Turkette*, they argue "that an enterprise is not a 'pattern of racketeering activity' and must be 'an entity separate and apart from the pattern of activity

in which it engages.'" *Id.* (quoting 452 U.S. 576, 583 (1981)). They then contend that Kinnetz's RICO claim is subject to dismissal because the alleged "association-in-fact enterprise and the alleged fraudulent activity are one and the same" and do not satisfy the requirement stated in *Turkette. Id.* at 12–13.

A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). Kinnetz pleads an association-in-fact enterprise. Docket 97 ¶ 127. "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States,* 556 U.S. 938, 946 (2009). "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Id.* at 947 (quoting *Turkette,* 452 U.S. at 583).

However, "evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Id.* (citation omitted). "In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering activity, we must 'determine if the enterprise would still exist were the predicate acts removed from the equation.'" *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354–55 (8th Cir. 2011) (quoting *Handeen v. Lemaire,* 112 F.3d 1339, 1352 (8th Cir. 1997)).

20

The amended complaint identifies the RICO defendants as: Benaiah Holdings, Benaiah Capital, Benaiah Digital, Benaiah Enterprises, Benaiah Management Company, Runway Four10, and Triple Point Trading (the Corporate Defendants) and Wiener and Gasca personally (the Individual Defendants). Docket 97 ¶ 127. The amended complaint alleges that the Individual and Corporate Defendants are associated in fact and engaged in the pattern of racketeering activity aimed at a common purpose. *Id.* ¶¶ 127–129. The amended complaint also sufficiently sets forth the existence of an enterprise distinct from the minimal association necessary to perpetrate the predicate acts because, setting aside the predicate acts, the enterprise has an ascertainable structure beyond what is necessary to perpetrate the predicate acts. *See* Docket 97 ¶¶ 33–69; *see also Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770 (8th Cir. 1992) ("The focus of the inquiry is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense."). Therefore, the Movants have not shown that Kinnetz failed to sufficiently plead this element.

## III.   Whether Kinnetz sufficiently pled the separateness of RICO defendants and the enterprise

The Movants contend Kinnetz failed to sufficiently plead two distinct entities (a person and an enterprise) because the allegations set forth that "the 'person[s]' who are accused of violating 18 U.S.C. § 1962(c) are identical to the 'enterprise,' the affairs of which the RICO Defendants are allegedly 'conduct[ing] or participat[ing]' in conducting." Docket 104 at 13; Docket 147 at 11. The Movants assert that to properly plead two distinct entities, Kinnetz

21

could not "name[] everyone that comprised the alleged association-in-fact as RICO Defendants[.]" Docket 147 at 11–12.

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001). Although the members of Kinnetz's alleged association-in-fact enterprise are also the named RICO defendants in his amended complaint, no defendant is alleged to be a RICO person and *the* RICO enterprise. Rather, each defendant is alleged to be a RICO person and *a component* of the larger RICO enterprise. As the Eighth Circuit explained, "[a] collective entity is something more than the members of which it is comprised." *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986, 995 (8th Cir. 1989); *see also Alitsource S.A.R.L. v. Szumanski,* No. 21-03293, 2022 WL 909872, at *5 (D.N.J. Mar. 29, 2022) (determining that overlap between the RICO persons and members of an association-in-fact enterprise is permissible in part because "it would make little sense to say that if separate suits are brought against each of multiple defendants, there is person/enterprise distinctness, but that distinctness is lost if all of the individuals composing the enterprise are sued in the same case" (citation omitted)). Therefore, Kinnetz has sufficiently pled the existence of two distinct entities—a person and an enterprise as required under § 1962(c).

### IV.    Whether Kinnetz sufficiently pled an injury proximately caused by the RICO conduct

The Movants assert that Kinnetz fails to plead actual harm caused by the alleged predicate acts. Docket 104 at 14. They claim that the first amended complaint establishes that Kinnetz, after the 2022 global market crash, voluntarily took a $2 million loss for tax purposes based on advice of his tax professionals and not because of any alleged predicate acts. *Id.* at 14–15. They further assert that Kinnetz has not specifically set forth what alleged predicate acts caused injury to his $1 million investment, which had a balance, at least according to the November 2024 statement, of $956,124.53. *Id.* at 15. Finally, the Movants contend that Kinnetz "fails to plausibly allege how anyone, including Mr. Kinnetz, relied on any alleged fraudulent misrepresentations" or was deceived. *Id.* at 15–16.

In response, Kinnetz asserts that the amended complaint sufficiently sets forth that the RICO defendants' racketeering activity proximately caused his harm and that he relied, to his detriment, on thesed fraudulent misrepresentations. Docket 127 at 15–16. He claims he describes with particularity "which of the defendants' predicate acts caused [him] to suffer the loss of the funds he sent to Benaiah Capital and Benaiah Digital" and "the persons involved in each act as well as the manner, content, dates, and times of a number of mails and wires." *Id.* at 15. In his view, he "could not have been injured more directly and proximately, as the predicate acts directly caused [his] losses: repeated uses of mails and wires were the very instruments for moving [his] investments from their proper places (exchange or bank accounts

23

under the control of the defendants) to improper places (accounts owned personally by the defendants), and of misleading [him] as to the nature of these activities." *Id.* at 16.

"[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" *Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). This requires showing "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268.

While the Movants attribute Kinnetz's harm to his reliance on the advice of tax professionals and his lawyer, the Court must accept Kinnetz's factual allegations as true. In that regard, Kinnetz alleges that the tax loss decision "was made with the assurance from Benaiah and Wiener that it would 'reinvest' in crypto assets after the realized loss" and that "Wiener, through Benaiah Capital, made a verbal representation to Kinnetz that such 'reinvestment' was made on its behalf on 17 February 2023." Docket 97 ¶¶ 88, 89. Kinnetz also sets forth sufficient factual allegations detailing a direct relationship between his injury (the loss of the funds he sent to Benaiah Capital and Benaiah Digital) and the fraudulent misrepresentations, on which he relied detrimentally, related to the Trust's $4 million. In particular, Kinnetz's first amended complaint pleads with particularity the fraudulent acts done and statements made to convert, trade, misuse, and hide Kinnetz's funds through a pattern of racketeering activity. *See id.* ¶¶ 88, 89, 92–95, 103–106, 130, 132,

135. Therefore, the Movants have not shown that Kinnetz failed to adequately plead an injury proximately caused by the predicate acts.

## ORDER

For the reasons set forth above, it is hereby

ORDERED that the motion to dismiss the complaint, Docket 39, and motion to dismiss crossclaims, Docket 41, are denied as moot. It is further

ORDERED that the motion to dismiss the first amended complaint, Docket 103, is denied.

Dated May 20, 2026.

BY THE COURT:

/s/ *Camela C. Theeler*

CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE